## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-23494-Civ-HUCK/O'SULLIVAN

Olem Shoe Corp.,
a Florida corporation,

       Plaintiff/Counter-Defendant,

vs.

Washington Shoe Co.,
a Washington corporation,

       Defendant/Counter-Plaintiff.

_____/

### WASHINGTON SHOE'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON TRADE DRESS INFRINGEMENT

COMES NOW, Defendant/Counter-Plaintiff, Washington Shoe Company ("Washington Shoe") and responds to Plaintiff/Counter-Defendant, Olem Shoe Corporation's ("Olem") PL.'S MOT. FOR PARTIAL SUMM. J. ON DEF.'S COUNTERLCAIM'S COUNT II (TRADE DRESS INFRINGEMENT), D.E. 135.

### I.  STATEMENT OF THE FACTS

For over 100 years, Washington Shoe has been building its reputation of making quality outdoor boots.  Washington Shoe's Western Chief Brand work boots were originally made for the Alaska Gold Rush.  Among Washington Shoe's several successful boot and accessory brands is Western Chief Women™, a registered trademark of Washington Shoe.  Washington Shoe has a long history of marketing its highly popular women's rain boots, including the Ditsy Dots boots at issue in this case, under the Western Chief Women™ brand name.[1]

---

[1] Rather than repeat detailed descriptions of the patterned designs at issue in this matter, Washington Shoe hereby incorporates by reference Aff. Of Karl Moehring in Supp. Of Washington Shoe Co's Mot. For Summ. J ¶¶ 6-10, D.E. 104.

The public associates the Western Chief name with Washington Shoe's boots as a result of its direct marketing efforts on the Western Chief website (www.westernchief.com), Washington Shoe's catalog (available through Western Chief's and Washington Shoe's websites), advertisements in trade magazines such as *Footwear Plus*, *Footwear News*, and *WSA Daily*, appearances at trade shows[2], advertisements in catalogs for national retail chains with stores in Florida, and with popular online retailers.  Moreover, the Ditsy Dots design was featured in *Woman's Day* magazine in an unsolicited print advertisement[3].  The design has also appeared on the *NBC Today Show*, and has benefited from various celebrity placements as well, adding to its national exposure.[4]

Washington Shoe's Ditsy Dots boots are sold at major retail and online stores, including but not limited to, Target, Sears, Shoes.com, Endless.com, Tractor Supply, Siamese Dream, Shoe Station[5] and Ebay[6].  Advertisements from Sears, Shoes.com, Endless.com, Tractor Supply, Siamese Dream and Ebay featuring the "Western Chief Ditsy Dots Rain Boots"[7] with a picture of the boot that matches the deposit materials submitted to the copyright office[8].  In addition, the court will note that the aforementioned advertisements often include detailed descriptions of the design, such as "a modern twist to a classic look with a vibrant, polka dot-print rubber upper."[9]

The Ditsy Dots trade appeared in many widely circulated print advertisements, including the nationally distributed Target Circular and the Lamey Wellehan Catalog, as well as many

---

[2] *See* Decl. of Karl Moehring ¶ 7.
[3] See Decl. of Karl Moehring Exh. 2.
[4] See Decl. of Karl Moehring ¶ 9.
[5] Olem has advertised its Infringing Ditsy Dots boot design on Shoe Station's website as well.  See Decl. of Karl Moehring, Exh. 3 (screen-shot taken October 28, 2009).
[6] *See* Decl. of Karl Moehring ¶ 4.
[7] Target sells the Ditsy Dots boots, both black/white and multi-colored with black background under Targets' Merona brand with permission from Washington Shoe.  See Decl. of Karl Moehring, ¶ 22.
[8] *See* D.E. 104-1
[9] See Decl. of Karl Moehring ¶ 11, Exh. 5.

other.[10]  Washington Shoe's Ditsy Dots appeared in the March Target Circular and has appeared in other Target circulars on numerous other occasions.[11]  In fact, Target, who sells over one billion $1,000,000,000 dollars in shoes per year, is the largest retailer that Washington Shoe sells to.[12]

Washington Shoe's Ditsy Dots boots retail from $24.99 at Target to $59.95 at Endless.com, with a median retail price of $39.00, at Siamese Dream.[13]  The Ditsy Dots boots are also available for purchase directly on Washington Shoe's website for $59.95.[14]  Incidentally, they are currently No. 4 on Washington Shoe's Best Seller List.[15]

The largest retailer that Washington Shoe sells to is Target, which sells over one billion $1,000,000,000.00 in shoes per year.  Washington Shoe sells both its Ditsy Dots and Zebra Supreme boot designs to Target.  (The popular Zebra Supreme design is marketed exclusively through Target stores, where the retail price is $24.99 a pair.)  There are well over 100 Target stores in the state of Florida aloe.[16]

---

[10] *See* Decl. of Karl Moehring, ¶¶ 24, 25. Exh. A, B.
[11] *See* Decl. of Karl Moehring ¶¶ 24, 25. Exh. A, B.
[12] *See* Decl. of Karl Moehring ¶ 14.
[13] *See* Decl. of Karl Moehring ¶¶  12, 16.
[14] *See* Decl. of Karl Moehring ¶ 13.  Exh. 6.
[15] *Id*.
[16] *See* Decl. of Karl Moehring, Exh. 8.



Google Map of Florida Showing Locations of all *126* Target Stores in the State

[ATTORNEYS EYES ONLY, *Filed Under Seal.  See* Paragrah 1 of Washington Shoe's Response to Plaintiff's Motion for Partial Summary Judgment on Trade Dress Infringement (Attorney's Eyes Only)][17]

Although Olem has still not been forthcoming in responding to Washington Shoe's discovery requests, present counsel estimates that based on the documentation produced outside of attorney-client privilege, and using a median sale price of $39.00, Washington Shoe ***lost*** gross profits of ***$2,705,040*** as a result of Olem's willful infringement of its Ditsy Dots design.[18]

According to the retailers who sell the boots bearing the designs at issue, Washington Shoe's copyrighted designs are well known to the consuming public and are associated with Washington Shoe's Western Chief brand.  For example, Jack Silberman, General Merchandise Manager for the Lamey Wellehan Shoes (a retailer with multiple locations in Maine), wrote in an email that "the Western Chief Ditsy dots rain boot has become the biggest seller we have had. We have sold over 350 pair in the last twelve months.  Our customers are now coming in and are asking for the boot by name, do you have the Western Chief Ditsy Dots rain boots?".[19]

---

[17] *See* Decl. of Karl Moehring (Attorneys eyes only), ¶ 17.
[18] *See* Decl. of Karl Moehring ¶¶ 26-27.
[19] *See* Decl. of Karl Moehring ¶ 19.  Exh. 14.

Another retailer, DLL Rainwear, which sells approximately $500,000 a year in rain boots online to customers throughout the United States, states that "DLL Rainwear has been selling Western Chief Ditsy Dot boots for many years and they have been one of our best selling styles. The Ditsy Dot design is well known as a Western Chief style and many of our customers have purchased multiple pairs from us over the years."[20]

In addition, in a declaration attached hereto, Vincent Deland of Mills Fleet Farm, a retailer with locations throughout the Midwest and online, testifies that "I associate the Ditsy Dot boot designs as having originated exclusively with Washington Shoe Company...[and] the Zebra Supreme boot designs as having originated exclusively with Washington Shoe."[21]

Besides direct testimonials from Washington Shoe's buyers, consumer reviews also clearly demonstrate that the public associates the copyrighted designs in question with Washington Shoe's Western Chief brand.  In fact, the sheer number of consumer reviews that members of the public have posted online for the designs at issue speaks for itself.

For example, on Endless.com, there are eight customer reviews for "Western Chief Women's Ditsy Dots Rain Boot".[22]  The same website features a detailed description of the Ditsy Dots rain boot from Western Chief and an advertising blurb about the brand's origin in Seattle in 1891.[23]

On Amazon.com's website, as of the August 27, 2010, there are 10 customer reviews for "Women's Ditsy Dots Rain Boots - Black/White", from as early as June 9, 2007 to as recent as

---

[20] *See* Decl. of Karl Moehring ¶ 20.  Exh. 15.
[21] *See* Decl. of Vincent Deland ¶¶ 6-8.
[22] *See* Decl. of Karl Moehring ¶¶ 23.  Exh. 4, 5, 9.
[23] *Id.*

March 11, 2010.[24]  Also on Amazon.com's website, is a customer review for "Western Chief Women's Ditsy Dots Rain Boot, by Western Chief", posted on April 6, 2010.[25]

On the shopping website Kaboodle.com, a customer review was posted on March 3, 2010, for the product described as "[T]he Ditsy Dots rain boot from Western Chief...".[26]

On Target's website, as August 27, 2010, there are 19 consumer reviews posted for Washington Shoe's "Women's Zebra Rain Boots - Black/Silver", which are Washington Shoe's Zebra Supreme boots, from as early as December 9, 2008 to as recent as August 3, 2010.[27]  Also on Target's website, there are over 64 consumer reviews posted for "Women's Ditsy Dots Rain Boots - Black/White" alone, from as early as January 12, 2007 to as recent as August 3, 2010.[28]

The plethora of consumer reviews that have been posted online since the introduction of the Ditsy Dots and Zebra Supreme designs by Washington Shoe would probably not exist without Washington Shoe's extensive marketing efforts.

[ATTORNEY'S EYES ONLY, *Filed Under Seal*.  *See* paragraph 2 of Washington Shoe's Response to Plaintiff's Motion for Partial Summary Judgment on Trade Dress Infringement (Attorney's Eyes Only][29]

These expenditures, combined with its longstanding reputation for quality boots, and its sales relationships with major retailers generated the high sales volumes described above and the obvious excitement in the marketplace surrounding its boot designs.

---

[24] *See* Decl. of Karl Moehring ¶ 23.  Exh. 10.
[25] *Id*.
[26] *See* Decl. of Karl Moehring ¶ 23.  Exh. 11.
[27] *See* Decl. of Karl Moehring, Exh. 12.
[28] *See* Decl. of Karl Moerhing, Exh. 13.
[29] *See* Decl. of Karl Moerhing (Attorneys Eyes Only), ¶ 18.

## II.  ISSUES PRESENTED

1. Whether Olem's motion for summary judgment on trade dress should be denied when courts hold that exact copying creates an evidentiary presumption of secondary meaning (the issue challenged by Olem) and when the infringing boots sold by Olem are exactly the same as the ones designed, manufactured and sold by Washington Shoe?

2.  Whether Olem's motion for summary judgment on trade dress should be denied when courts hold that the mere "likelihood of confusion" in the market creates a fact issue when and when the infringing boots sold by Olem are exactly the same as the ones designed, manufactured and sold by Washington Shoe?

3.  Whether Washington Shoe's trade dress is inherently distinctive when fanciful designs like the Ditsy Dots and Zebra Supreme are arbitrarily applied to rain boots designs and when the relevant consumers, retailers and wholesalers have come to know these fanciful designs as originating with Washington Shoe?

4.  Whether Washington Shoe's trade dress, in the alternative, has acquired secondary meaning when fanciful designs like the Ditsy Dots and Zebra Supreme are arbitrarily applied to rain boots designs and when the relevant consumers, retailers and wholesalers have come to know these fanciful designs as originating with Washington Shoe?

5.  Whether Olem's motion for summary judgment on trade dress should be denied, in the alternative, when courts have extended protection to trade dress which has not yet acquired secondary meaning (secondary meaning "in the making") to avoid rewarding an infringer for wrong doing and when Olem created an exact copy of Washington Shoe's product?

6.  Whether Olem's motion for summary judgment on trade dress should be denied when trial courts disfavor deciding trademark / trade dress cases on summary judgments because the ultimate issue is so inherently factual and when there are issues of material fact with respect to Washington Shoe's trade dress?

## III.  LEGAL ARGUMENT

### A.  Summary of the Argument

Olem argues that Washington Shoe's trade dress of the two boots it is accused of infringing (Ditsy Dots and Zebra Supreme) cannot exist because the legally requisite "inherent distinctiveness" or the alterative "secondary meaning" has not been established.   Olem's argument crashes for a number of reasons.

First, Olem neglects to advise this court of the evidentiary presumption of secondary meaning when exact copying occurs, which is exactly what Olem is accused of.    This evidentiary presumption is an inherently factual issue reserved for the fact finder, which precludes summary judgment.

Second, Olem fails to advise this court that trial courts disfavor deciding trademark / trade dress cases on summary judgments because the ultimate issue is so inherently factual and that the trade dress issues are for the fact finder to decide.

Third, Washington Shoe's trade dress is inherently distinctive (or has acquired secondary meaning) because fanciful designs like the Ditsy Dots and Zebra Supreme arbitrarily applied to rain boots meets the definition of "inherently distinctive" and because the relevant consumers, retailers and wholesalers have come to know these fanciful designs as originating with Washington Shoe, another fact issue reserved for the jury.

Lastly, even if secondary meaning, which necessarily takes time to develop[30], is still "in the making" courts allow the issues to be presented to the fact finder to not reward infringers quick to jump the gun on exact copying.

### B. Summary Judgment

"Trial courts disfavor deciding trademark cases in summary judgments because the ultimate issue is so inherently factual." *Levis Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 n. 5 (9th Cir. 1985). For Summary Judgment there must be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered.[31] *Gasser Chari Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (1995) citing

---

[30] There is no set time period during which secondary meaning must occur. Olem's arguments to the court saying it takes at least five years to develop secondary meaning are simply wrong. Pl. Mtn. for Partial Summary Judgment, Pg. 9, Doc #135 ("There are simply no reported cases where 'secondary meaning' has been acquired in such a brief time").

Secondary meaning can occur for trade dress in far less than five years. In fact, in *L.A. Gear Inc.*, a fashionable athletic shoe's design was held to have achieved secondary meaning during a **period of about six months**, despite the infringer's claim that "this period of time was too short for the acquisition of secondary meaning." *L.A. Gear Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 25 U.S.P.Q.2d 1913, 1922 (Fed. Cir. 1993) (holding a fashionable athletic shoe's design was held to have achieved secondary meaning during a period of about six months, despite the infringer's claim that "this period of time was too short for the acquisition of secondary meaning.").

Washington Shoe has been producing boots since 1891, a period of more than 100 years. They have been designing fanciful rain boot patterns and designs for several years. Whether it be several years or 100 years, both are in excess of the six months the Federal Circuit has found to be sufficient to obtain secondary meaning. Therefore, there is a genuine issue of material fact sufficient to deny Olem's motion for summary judgment.

[31] See also *Click Billiards Inc. v. SixShooters Inc.*, 251 F.3d 1252 (9th Circ. 2001)(Overruling of District's Court's granting of summary judgment where there was sufficient evidence to raise triable issue of fact on issues of secondary meaning and likelihood of confusion); *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 f.3d 929 (6th Cir. 2001)(Overruling of District's Court's granting of summary judgment where there was sufficient evidence to raise triable issue of fact on issues of secondary meaning); *Ashley Furniture Industries, Inc. v. SanGiacomo, N.A. Ltd.*, 187 F.3d 363 (4th Cir. 1999); *Vileroy & Boch Keramische Werke K.G. v. THC Systems Inc.*, 999 F.2d 619 (2nd Cir. 1993); *Gasser Chair Co., Inc., v. Infanti Chair Manufacturing Corp.*, 60 F.3d 770, (1996)(several issues of material fact made summary judgment inappropriate); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 2001)(fact issues precluded summary judgment on trade infringement claim); *Insty*bit Inc., v. Poly-tech Industries*, 95 F.3d 663 (8th Cir. 1996); *Nora Beverages, Inc., v. Perrier Group of America*, 164 F.3d 736 (2nd Cir. 1998); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3rd 1192 (1994)(summary judgment reversed because material issues of fact existed, precluding summary judgment as to whether design of a spice container was inherently distinctive).

9

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 1039, 22 USPQ2d 1321, 1333

(Fed. Cir. 1992).

> **C.  Because Olem Shoe produced an exact copy of Washington Shoe's Ditsy Dot and Zebra Supreme boots, the courts should presume the existence of trade dress.**

Courts have held that exact copying creates an evidentiary presumption of trade dress.

*DAP Products, Inc. v. Color Tile Mfg. Inc.*, 821 F. Supp. 488, 492, 27 U.S.P.Q.2d 1365 (S.D.

Ohio).  The rationale behind this assumption is that there is no logical reason for the attempt at

copying save an attempt to realize upon a secondary meaning that is in existence.  *Id.* citing

*Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991).[32]

Washington Shoe has established the similarities of the Ditsy Dot and Zebra Supreme

design.  Olem has even gone so far as to copy the minute errors in the Zebra Supreme pattern.

Declaration of Timothy B. McCormack, pp. 2-5.  Defendant Wa. Shoe's Noticeo Filing Exhibits:

Close-Up Photos of Wa. Shoes' and Olem's Boots, Documents 130.   If imitation is the sincerest

form of flattery, it is also evidence that your design has come to be known by the national public.

It does not make sense to copy something that is unpopular or unknown.  Olem's exact copies of

---

[32] Moreover, evidence of deliberate copying is relevant to a determination of trade dress which is shown by establishing the trade dress is inherently distinctive on the one hand or has  secondary meaning on the other hand. *Transgo Inc.*, 768 F.2d at 1015-16.  "[I]n appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning."  *Click Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1264 (9th Cir., 2001) citing *Fuddruckers Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (1995).

In addition, proof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning.  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir.  1988) citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557 (9th Cir. 1960).  "There is no logical reason for precise copying save an attempt to realize upon a secondary meaning that is in existence."  *Id.*  For example, in *Transgo, Inc.*, the court found that where the record indicated that the competitor company copied "virtually everything" with regard to the infringed product, it was clear that the defendant had attempted to capitalize on the secondary meaning of the plaintiff's product in order to "obtain an advantage from the good will built up" by the plaintiff.  *Id.* at 1016.  While the exact copying was not the only factor the court considered with respect to secondary meaning, it was crucial to the determination that a jury could find that there was substantial evidence to support secondary meaning.  *Id.*

the Ditsy Dot and Zebra Supreme designs prove secondary meaning.   Therefore, there is a genuine issue of material fact to deny Olem's motion for summary judgment on the trade dress infringement claim.

### D.   The mere "likelihood of confusion" in a trade dress case creates an issue of fact for the Jury.

Similar to the holdings described above, some courts hold that the mere "likelihood of confusion" in a trade dress case creates an issue of fact for the jury.  *McNeil Nutritionals, LLC. v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3rd Cir. 2007) citing *A & H Sportswear, Inc. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 237 (3rd Cir. 2000) ("The question of likelihood of confusion is ultimately one of fact, and we cannot roll up our sleeves and engage in the balancing ourselves.")   [T]he touchstone test for a violation of § 43(a) is the 'likelihood of confusion' resulting from the defendant's adoption of a trade dress similar to the plaintiff's."  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986) citing *Original Appalachian Artworks, Inc.*, 684 F.2d 821, 831-32 (11th Cir. 1982).

A trade dress is entitled to protection where its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product.  *Insty\*Bit, Inc. v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 667 (8th Cir. 1996).  In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of advertising media used, the defendant's intent, and actual confusion.  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538, 1 U.S.P.Q.2d 1161 (11th. Cir. 1986).  "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists.  Rather, a court must evaluate the weight to be accorded the individual factors

and then make its ultimate decision." *AmBrit, Inc.* 812 F.2d at 1537.  The weight of these factors varies with the circumstances of the case.  *Id.*

As detailed above, Washington Shoe's designs have acquired secondary meaning through extensive advertising, market exposure, sales, and the like, which evidences a strong mark. Olem's designs are exact copies of the Washington Shoe designs.  The products are both rubber rain boots, appear at the same trade shows, and are direct competitors in the footwear market. Olem's exact copying of the Washington Shoe designs evidences an intent to "pass off" their designs as Washington Shoe designs.  If given more time, Washington Shoe would likely be able to obtain examples of actual public confusion through a market survey.  All of the above factors for likelihood of confusion are fulfilled by the facts at issue.  Even when weighing the factors as a whole, the presence of evidence for each factor necessitates a finding of actual confusion. Customer reviews further reinforce the strength of the trade dress by their statements regarding the actual design of the boots, which also adds to the likelihood of confusion.

Therefore, there is a genuine issue of material fact related to actual confusion and Olem's summary judgment must be denied.

### E.  Washington Shoe's boots are inherently distinctive.

In order to ultimately prove trade dress, a party must show that the product is inherently distinctive or has acquired secondary meaning.  *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (1998).  Whether a particular trade dress is inherently distinctive is a question of fact. *Tone Bros. Inc., v. Sysco Corp.*, 28 F.3d 1192, 1201 (1994).

In determining whether a trade dress or trademark is sufficiently distinctive to be entitled to protection under the Lanham Act, the courts look at whether the trade dress is (1) arbitrary[33] or fanciful[34], (2) suggestive[35], (3) descriptive[36] or (4) generic. If the dress is "arbitrary or fanciful" or "suggestive", it is deemed inherently distinctive and therefore entitled to protection, because its "intrinsic nature serves to identify a particular source of a product." *Inst\*Bit, Inc. v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 673, citing *Two Pesos Inc., v. Taco Cabana*, 505 U.S. 763, 768 (1992). "The focus of the inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive." *Tone Bros. Inc. v. Sysco Corp.*, 28 F.3d 1192, 1206 (1994). If a product is inherently distinctive, secondary meaning need not be demonstrated, *Callaway Golf Co. v. Golf Clean, Inc.*, 915 F. Supp. 1206, 1212 (1995) citing *Two Pesos*, 505 U.S. at 773, 112 S.Ct. at 2760.

Throughout their history, rain boots have been a utilitarian piece of footwear. Most women would agree that rain boots were not exactly their go-to pair of footwear that made them feel beautiful. Rather, rain boots had a specific utilitarian purpose, to stay dry in the rain or clean in the muddy garden. It is only recently that companies, led by Washington Shoe, have thought to place colorful patterns and designs onto rain boots to enliven them and entice the wearer on even the dreariest of days. It is fitting that this would occur in Seattle, Washington Shoe's headquarters, where nine months of rain is a common occurrence. Patterns associated with

---

[33] "Arbitrary" ("Camel" cigarettes). *Wal-Mart Stores, Inc.*, 529 U.S. at 210-211.
[34] The Second Circuit explained in *Abercrombie* that the term *"fanciful" as a classifying concept, is usually applied to marks invented solely for their use as trademarks or trade dress. Ambercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 n. 12 (2nd Cir. 1976); see also *Wal-Mart Stores, Inc.*, 529 U.S. at 210-211 ("Fanciful" ("Kodak" film)).
[35] "A suggestive mark is 'one that requires some measure of imagination to reach a conclusion regarding the nature of the product." *Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996); see also *Wal-Mart Stores, Inc.*, 529 U.S. at 210-211 ("suggestive ("Tide" laundry detergent)).
[36] A descriptive trademark or trade dress "immediately conveys the nature or function of the product". *Duluth*, 84 F.3d at 1096.

Washington Shoe include Ditsy Dots and Zebra Supreme, and numerous other designs not at issue in this proceeding, such as spiders, paisley, skulls, and koi fish.

Patterns such as those are not commonly seen on footwear, let alone rain boots. This is an arbitrary association of a fanciful design – the very definition of "inherent distinctiveness" and "secondary meaning." Additionally, when the relevant consumer, retailer or wholesaler sees these fanciful rain boot design in the marketplace, they associate them with Washington Shoe Company. Therefore, there is a genuine issue of material fact sufficient to deny Olem's motion for summary judgment.

## F.  Washington Shoe's Boots have Acquired Secondary Meaning.

If a trade dress owner cannot show its product is inherently distinctive it must show that the product has acquired secondary meaning.[37]  *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (1998).  "Whether a particular trade dress has acquired secondary meaning is a question of fact."  *First Brands Corp. v.Fred Meyer*, *Inc.*, 809 F.2d 1378, 1383 (2001).

The inquiry into secondary meaning is "clearly a subjective factual determination" and is by its nature a "fact dependent question."  *In re Gammon Reel, Inc.*, 227 USPQ 729, 730 (TTAB 1985)(configuration of surveyor's reel registered due to sufficient evidence of second meaning); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 25 USPQ2d 1913, 1923 (Fed. Cir. 1993).  Secondary meaning is acquired when in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the source itself.  *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (1998) citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163, 115 S.Ct. 1300, 1303 (1995).

---

[37] In some cases the trade dress owner need only show that secondary meaning is "in the making" or is being developed and an infring er can still be held liable for "jumping the gun" when racing to the market with infringing product.  This argument is detailed in a separate section of this brief.

Secondary meaning occurs when the mark is "Closely identified with goods of one producer or has otherwise gained public recognition." *Carter-Wallace, Inc. v. Procter & Gabmle Co.*, 434 F.2d 794, 800 (9th Cir. 1970).  Evidence that demonstrates secondary meaning includes buyer exposure to the mark in the form of the nature and extent of advertising, length of use, size of the company, ad sales.  *See In re Instant Transactions Corp.*, 201 U.S.P.Q. 957 (T.T.A.B. 1979); *In re Johnson & Johnson*, 186 U.S.P.Q. 559 (T.T.A.B. 1975); *In re Hayes*, 154 U.S.P.Q. 493 (T.T.A.B. 1967); *Kaiser Aluminum and Chemical Corp. v. American Meter Co.*, 153 U.S.P.Q. 419 (T.T.A.B. 1967); *Federal Glass Co. v. Corning Glass Works*, 162 U.S.P.Q. 279 (T.T.A.B. 1969).

Secondary meaning can even be established before the product enters the market by pre-sales publicity.  *See Metro-Goldwyn Mayer, Inc. v. Lee*, 212 Cal.App.2d 23, 27 (2d Dist. 1963); 2 McCarthy on Trademarks and Unfair Competition §15:57 (4th ed.) (arguing that the precedent of the motion picture cases can be applied as a general rule).

> ### i. Washington Shoe has put forth material facts at issue that support the relevant factors for secondary meaning.

"Secondary meaning has been defined as *association*, nothing more."  *Transgo*, *Inc.*, 768 F.2d at 1015.  Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying.  *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (1998) citing *Spraying Systems Co. v. Delevan, Inc.*, 975 F.2d 387 (7th Cir. 1992).

Fanciful boot designs, such as Ditsy Dot and Zebra Supreme, have acquired secondary meaning through Applicant's advertising, sales, and company size.

Since 1891, Applicant Washington Shoe Company has been in the footwear industry, which they began in the Seattle area by selling rugged work boots to miners of Alaskan Gold Rush.   Over the years, Washington Shoe Company expanded their operation to design, manufacture, distribute, and sell various product lines of men's, women's and children's footwear in the United States and abroad, directly and/or through its licenses.   Therefore, Washington Shoe Company is a well-known name in the footwear industry.

[ATTORNEYS EYES ONLY, *Filed Under Seal*.  *See* Paragraph 3 of Washington Shoe's Response to Plaintiff's Motion for Partial Summary Judgment on Trade Dress Infringement (Attorney's Eyes Only)]

This advertising was in the form of online marketing with a variety of retailers posting advertisements visible to millions of people, popular print magazines, television, trade magazines, tradeshows and other forums.  The trade dress of the Ditsy Dots and Zebra Supreme designs have come to be known both in the trade and by the public as having come from Washington Shoe Company or its brand Western Chief.  *See* Decl. of Karl Mohering ¶¶ 6, 7.

Washington Shoe Company has a prominent position in the footwear segment of the retail market through participation in industry trade shows.   Celebrities have been spotted wearing Washington Shoe Company boots.  The above examples demonstrate the American and International public's wide exposure to Washington Shoe Company's designs and products.  The public has come to associate fanciful distinctive rain boots with Washington Shoe Company.

Both the Ditsy Dot and Zebra Supreme Design have been sold via major national retailers, such as Target, which as an audience of millions of consumers.  Decl. of Karl Moehring ¶ 14.  Washington Shoe Company boots have garnered much press attention in national and international magazines such as *Woman's Day Magazine*, *Footwear Plus, Footwear News*, and *WSA Daily* as well as being featured on the Today Show.  Moreoever, Washington Shoe's Ditsy

Dots design was featured in Target's circular catalog as well as the Lamey Wellehan catalog. The public has come to associate fanciful distinctive rain boots with Washington Shoe Company.

Moreoever, emails from wholesaler customers to Washington Shoe show that Washington Shoe's buyers and their retail customers associate the boots bearing the designs at issue with Washington Shoe and its brand.  Decl. of Karl Moehring, Exh. 14, 15.

[ATTORNEYS EYES ONLY, *Filed Under Seal*.  *See* Paragrah 4 of Washington Shoe's Response to Plaintiff's Motion for Partial Summary Judgment on Trade Dress Infringement (Attorney's Eyes Only)]

As detailed by the above evidence, the public has been exposed to Applicant's designs via company name, reputation, and advertising.  The public associates quality footwear and fanciful boot designs with the Washington Shoe Company name.

### ii.    The likelihood of confusion with the identical boots supports a finding of secondary meaning.

Secondary meaning can also be established by evidence of likelihood of confusion. *Transgo, Inc.*, 768 F.2d at 1015 citing *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1297 (9th Cir. 1971).  In *Transgo*, the court held that a jury could find a product had acquired secondary meaning by relying on the confusing similarity of the competing products at issue.  *Id*. at 1016.  Importantly, the products in question were identical and the class of goods were the same.  *Id*. at 1016.

In addition, proof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning, which can transform a trade dress that might not be inherently distinctive into one that is.  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015-16 (9th Cir.  1988) citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557 (9th Cir. 1960); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (1994).  In *Transgo, Inc.*, the court found that where the record indicated that the competitor company

copied "virtually everything" with regard to the infringed product, it was clear that the defendant had attempted to capitalize on the secondary meaning of the plaintiff's product in order to "obtain an advantage from the good will built up" by the plaintiff. *Id*. at 1016. While the exact copying was not the only factor the court considered with respect to secondary meaning, it was crucial to the determination that a jury could find that there was substantial evidence to support secondary meaning. *Id*.

As was the case *Transgo*, here, the products are exactly identical and the class of goods are the same. This is proof of exact copying and is sufficient to establish secondary meaning. Also, as in *Transgo*, the copying of virtually all aspects of Washington Shoe's Ditsy Dots and Zebra Supreme boots indicates that Olem intended to capitalize on Washington Shoe's secondary meaning and goodwill acquired in the marketplace over time.

### G. Trade dress and copyright claims are mutually inclusive.

A trade dress owner can win on both a claim of trade dress and copyright infringement. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 12 U.S.P.Q.2d 1423 (7th Cir. 1989), cert. denied, 493 U.S. 1075 (1990)(profits awarded where greeting card line infringed both copyright and trade dress rights); see also *Carol Cable Co. v. Grand Auto, Inc.*, 4 U.S.P.Q.2d 1056 (N.D. Cal. 1987)(reported in the United States Patent Quarterly reporter) cited in *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121, 1128+ (N.D. Cal. 2009), *Durango Herald, Inc. v. Riddle*, 719 F.Supp. 941, 949 (D. Colo. 1988), *Lisa Frank, Inc. v. Impact Intern, Inc.*, 700 F.Supp. 980, 997 (D. Ariz, 1992). For example, in *Carol Cable Co.*, both copyright claims and trade dress claims were successfully asserted with respect to a box containing battery booster cables which were copied by a former customer of the trade dress owner. The box was held to be distinctive trade dress, and the graphics and text on the box were also protected by a copyright registration,

justifying the issuance of a temporary restraining order, then a preliminary injunction, on both grounds. *Carol Cable Co.*, 4 U.S.P.Q.2d. at 1063-64.

In the present matter, Washington Shoe has raised claims of copyright infringement and trade dress infringement. Washington Shoe has sufficiently pled its copyright infringement claim stating that Counter-Defendant has "offered for sale, sold, displayed and distributed,…rubber boots that infringe Washington Shoe's copyrighted Ditsy Dots and Zebra works" and included an exhibit that evidences the "striking similarity of the Infringing Boots sold by Counter-Defendant to the Ditsy Dots and Zebra copyrights owned by Washington Shoe." Washington Shoe's Answer and Counterclaim, p. 7, paras. 11 & 12; Exhibit 5. In paragraph 19 of the Washington Shoe's counterclaim, Washington Shoe states that they did not authorize Counter-Defendant to use Ditsy Dots or Zebra Supreme copyright or trade dress. Washington Shoe's Answer and Counterclaim, p. 8, para. 19.

Washington Shoe has brought its trade dress claim under the Lanham Act in the alternative of its copyright infringement claim. Washington Shoe's Counterclaim at p. 11. Washington Shoe has supported that claim by pleading trade dress, and likelihood of confusion with the Olem infringing designs. Washington Shoe's Answer and Counterclaim, pp. 11, 8, & 7, respectively.

Based on the above legal precedents, copyright and trade dress infringement claims are not mutually exclusive; a party can win on both matters. Washington Shoe has pled and demonstrated both copyright and trade dress infringement. Therefore, Washington Shoe may win on both claims of copyright and trade dress infringement.

### H.  Even if secondary meaning had not occurred, the court should enforce the trade dress because it was "in the making."

Even if secondary meaning has yet to develop, courts have extended protection to trade dress which has not yet acquired secondary meaning , where the process of acquiring secondary meaning is ongoing.  In this situation, secondary meaning is still "in the making".  In these situations, courts have been loath to let the infringer benefit from its own wrongdoing by interfering with the trade dress owner's development of secondary meaning.  *Jolyy Good Indust., Inc. v. Elegra, Inc.*, 690 F. Supp. 227, 231, 9 U.S.P.Q2d 1534 (S.D.N.Y. 1988).  The rationale of this doctrine is to prevent intentional copiers from capitalizing upon the efforts of others.  A. Dowell, "Trade Dress Protection of Product Designs:  Stifling the Progress of Science and the Useful Arts for an Unlimited Time," 70 Notre Dame L. Rev. 137 147 (1994).

Washington Shoe has been making boots for over 100 years and has made a name for itself as a quality boot and footwear manufacturer.  Assuming *arguendo* that the fanciful designs have not obtained secondary meaning, Washington Shoe's name certainly has obtained secondary meaning.  As evidenced by its advertising expenditures alone, Washington Shoe put forth a significant effort to have consumers and wholesale customers associate the Ditsy Dots and Zebra Supreme designs with its company.  Based on the holdings cited above, the court should not reward Olem by allowing it to trade on Washington Shoe's existing goodwill and damage the goodwill in the making in relation to fanciful boot designs.  Therefore, the Court should deny Olem's summary judgment motion.

### I.  Rule 56 Request

Although Washington Shoe has established that Olem is not entitled to summary judgment on this issue, if the court is at all in doubt, Washington Shoe moves this court under rule 56 for additional time to gather additional evidence involving, but not limited to, customer

surveys showing that Olem's infringing boots are easily and consistently misidentified as Washington Shoe boots in the eyes of the average consumer.

## CONCLUSION

Olem has infringed Washington Shoes trade dress for its Ditsy Dots and Zebra Supreme boots and is thus entitled to relief.  This court should deny Olem's motion for summary judgment and refuse to reward its infringement of Washington Shoe's legal trade dress.

DATED this 31st day of August, 2010.


Respectfully submitted,


S/ Timothy B. McCormack
Timothy B. McCormack (WSBA #28074)
*tim@mccormacklegal.com*
McCormack Intellectual Property PS
617 Lee St, Seattle, WA  98109
T: (206)381-8888; F: (206)381-1988
Attorney, pro hac vice, for Def. Washington Shoe Co.
-and-

Tom J. Manos, Esq. (Fla. Bar #174262)
*tmanos@tjmlawfirm.com*
Tom J. Manos Law Firm
801 Brickell Ave Fl 9
Miami, FL  33131-2945
T: (305)341-3100; F: (305)341-3102
Attorneys for Def. Washington Shoe Co.

## Certificate of Service

**I hereby certify** that on August 24, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/S/ Tom J. Manos

Tom J. Manos, Esq. (Fla. Bar #174262)

### SERVICE LIST
### Olem Shoe Corp. versus Washington Shoe Co.
### Case No. 09-23494-Civ-HUCK/O'SULLIVAN
### United States District Court, Southern District of Florida

**Copies furnished to:**
Jesus Sanchelima
*jesus@sanchelima.com*
Sanchelima & Associates P A
235 SW 42nd Ave
Miami, FL  33134-1762
Telephone:  (305)447-1617
Facsimile:  (305)445-8484
Attorneys for Plaintiff Olem Shoe Corp.
via CM/ECF notification

Bernardo Burstein
*bburstein@bursteinpa.com*
Burstein & Associates, P.A.
744 N.E. 125 Street
Miami, Florida 33161
Telephone: (305)981-9033
Facsimile: (305)981-9034
Attorneys for Plaintiff Olem Shoe Corp.
via CM/ECF notification

Tom J. Manos, Esq. (Fla. Bar #174262)
*tmanos@tjmlawfirm.com*
Tom J. Manos, P.A.
801 Brickell Avenue, 9th Floor
Miami, FL 33131-2945
Telephone: (305)341-3100
Facsimile: (305)341-3102
Attorneys for Defendant Washington Shoe Co.
via CM/ECF notification

Timothy B. McCormack (WSBA #28074)
*tim@mccormacklegal.com*
McCormack Intellectual Property PS
617 Lee St, Seattle, WA  98109
Telephone: (206)381-8888
Facsimile: (206)381-1988
Attorney, pro hac vice, for Defendant Washington Shoe Co.
via CM/ECF notification